UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

LAQUITTA MOORE,                              )
                                             )
              Plaintiff,                     )          Case No.:
v.                                           )
                                             )
BI STATE DEVELOPMENT AGENCY,                 )          **JURY TRIAL DEMANDED**
                                             )
              Defendant.                     )

## COMPLAINT
## TITLE VII

Plaintiff Laquitta Moore states as her Title VII Complaint:

### INTRODUCTION

1.    LaQuitta Moore is a licensed police officer.  For several years she worked successfully in

      security at the Bi State Development Agency, c/k/a "Metro," which operates the

      Missouri-Illinois bus and light rail system.  Edward "Tony" Smoote was above her in the

      supervisorory chain of command.  He began aggressively flirting with her.  She

      succumbed, (although she admits she has free will), and they started an affair.  Moore

      eventually could stand it no more and denied Smoote sex.  Moore was subject to a hostile

      work environment, gender discrimination and constructive discharge.  Moore brings Title

      VII claims and seeks damages and attorney's fees.

### PARTIES

2.    Plaintiff Laquitta Moore is an individual residing in St. Louis County, Missouri.

3.    Plaintiff is a woman.

4.    Under Title VII, 42 U.S.C. 2000e, Plaintiff is an "aggrieved individual."

5.     At all relevant times Bi State Development Agency ("Metro") has been a properly duly created and functioning government entity within the States of Missouri and Illinois, operating the region's light rail and bus system.

6.     At all relevant times Metro was Moore's Employer as that term is defined in Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e.

7.     Bi-State has approximately 2,500 employees.

## JURISDICTION AND VENUE

8.     Plaintiff brings this action pursuant to:

    a.     Title VII, 42 U.S.C. 2000e, in that Defendant created a hostile work environment,

    b.     Title VII, 42 U.S.C. 2000e, in that Defendant intentionally discriminated against Plaintiff based on her gender, and

    c.     Title VII, 42 U.S.C. 2000e, in that Defendant constructively discharged Plaintiff.

9.     This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343 and 2201, with the above described Title VII, 42 U.S.C. 2000e as the statute at issue.

10.     Venue is proper in this Court under 28 U.S.C. § 1391 because the relevant events occurred in the City and Counties of St. Louis, Missouri, both of which are within the Eastern Division of this Court.

## FULFILLMENT OF PREREQUISITE TO FILING TITLE VII CLAIMS

11.     On or about August 8, 2023, Plaintiff filed a Charge of Discrimination ("the Charge") with the Equal Employment Opportunity Commission ("EEOC").

12.     The EEOC assigned the matter charge number:  560-2023-03074.

13.     On September 15, 2023, the EEOC issued the Plaintiff a Right to Sue Letter, Exhibit 1.

14.   This complaint is being filed on November 3, 2023, which is 49 days after the EEOC
      issued the right to sue letter, and well before the 90 day deadline.

15.   Plaintiff has thus fully complied with the administrative prerequisites for the
      commencement of Title VII aspects of this action.

### JURY DEMAND

16.   With regard to all issues and claims set forth in this Complaint, including damages and all
      other relief requested, Plaintiff demands a jury trial.

### FACTS

17.   On January 8, 2018 Complainant Laquitta Moore started work full time as a licensed
      public safety officer for the Bi State Development Agency.

18.   At all relevant times she was qualified for her position.

19.   In approximately 2020, in the ordinary course of her duties, Moore met Edward "Tony"
      Smoote.

20.   By then Smoote was an employee of Metro, also working in security.

21.   By 2021 he was above her in her upward line of supervision, with one layer between
      them.

22.   During her employment with Metro Moore also worked secondary as a licensed police
      officer in Moline Acres, Missouri, a small municipality in St. Louis County.

23.   Smoote began coming onto Moore's job at Moline Acres by following her around in his
      personal car.  At such times she was usually on duty, and he was usually off duty.  He
      would commonly text her.  Slowly his texts became more intimate.  He pursued her and
      flirted with her.  He got into her mind and pressed her into a relationship.

24.   Moore had been separated from her Husband for many years.  In approximately the

3

spring of 2021 she began having an affair with Smoote, that is, they began having sexual intercourse. In fact, she fell in love with Smoote.

25. She lost her ability to resist, although she acknowledges that she has free will and could have, like all persons in such a situation, mustered the power say no.

26. Before Smoote had come to Metro, Moore had become "Acting Lead" as a Transportation Security Specialist while another officer, Officer Leatherwood, was recovering from surgery.

27. Moore retained that Acting Lead position until Leatherwood returned. By then her affair with Smoote was underway.

28. Moore wanted the permanent position as Lead.

29. Moore never received the permanent position as Lead.

30. Moore's relationship with Smoote became common knowledge of many other Metro employees including but not limited to Carlos Mojica, Angie Cuberson, Billie Coleman, Kimevee (last name unknown to Moore), Brian Young, and Vernon Summers.

31. During the affair Moore received special treatment. For example, if she were late for work there might be raised eyebrows, but there would be no write up or discipline. Similarly, she took long lunches with Smoote with no ill effect on her employment. She also rode around with Smoote in a Metro car, again with no ill effect on her employment.

32. In August of 2022, on the basis of a promise from Smoote to marry her, Moore completed a divorce from her husband.

33. On one occasion during the affair Moore and Smoote went into the offices of Vernon Summers, Smoote's boss. During that get-together Summers stated to Moore, while laughing, "this is how he got in trouble the first time,"

4

34.   Moore reasonably concluded from that statement that Summers (1) was aware that
      Smoote had previously engaged in at least one sexual relationship with a Metro
      employee, and (2) was aware that Smoote was now in a sexual relationship with her.

35.   On other occasions Moore and Smoote socialized with Summers at his home.  They acted
      as a couple.  Summers did nothing about the situation.

36.   On many occasions Moore had sex with Smoote on Metro property, including in
      Smoote's office.

37.   Moore and Smoote exchanged 100's of texts.

38.   At all relevant times Moore performed her duties for Metro in a competent, satisfactory
      manner, without discipline or employment problems.

39.   At all relevant times she met Bi State Development Agency's reasonable job
      expectations.

40.   In the fall of 2022 Moore decided the relationship with Smoote was stressful and its costs
      exceeded its benefits.

41.   She had known at all times that the relationship violated Metro policy, was volatile, and
      could cause problems with other employees.

42.   Moore began avoiding Smoote.

43.   In November 2022 Moore wholly ceased her sexual relationship with Smoote.  She never
      explicitly told him their affair was over, but she ceased getting into situations where sex
      would be a possibility.  For example, she ceased going to his house.

44.   Nevertheless, Smoote continued to pursue Moore and he asked her by texts and orally to
      continue their relationship, including their sexual relationship.

45.   During this period Smoote sent explicit videos to her, including videos of himself

masturbating. While they were on Messenger, he would recite to her the simultaneous

event of his masturbation.

46.     Moore made excuses to Smoote for denying him sex.  At times she blamed the denial of

sex on lack of Smoote's time due to Smoote's time commitment to his having a job

working secondary at Velda City.

47.     At all relevant times Moore had a Metro issued Android telephone to be used exclusively

for work.  During the final months of 2022 and the early months of 2023, however, it

appeared to Moore that her Metro issued cell phone had ceased working properly.  It

seemed not to receive emails.

48.     On inference, by then Mojica and/or Summers were aware Moore was denying sex to

Smoote.

49.     Moore told Mojica about the cell phone problem several times.  He told her to take it to

"IT."

50.     Moore dropped off the phone with IT and did not receive it back for months.

51.     After she received the phone back from IT Moore still could not make it receive emails.

52.     She could get emails on a work computer when at work.

53.     She could thus not get emails when not at work.

54.     Metro thus often used Moore's personal phone to contact her via calls and texts.

55.     On November 26, 2022, Moore received a text from Mojica, who by then was Moore's

direct supervisor.  The text said that he was giving her a heads up that "from here on out

Chad Fuller would be her direct supervisor."  The text also indicated a change in her

hours.

56.     Moore would have applied to that position, but Moore had Covid at the time, and no one

had informed her of the position being open and, as stated above she was not getting emails on her Metro phone, and she was not at work to get emails on her work computer.

57.    When Moore received the news that Fuller was her new boss, Moore used a squad area computer at work to request a meeting with Mojica and Smoot to discuss the change, and to discuss how she could get promoted.  She received no response.

58.    At approximately this time Mojica told Moore there would be a job opening in Metro's Revenue Department which would be a Monday through Friday job from 8-4.  Moore wanted the job because it would take her away from Smoote and the hours would be better.

59.    Moore sent an email, again from her squad area computer to Mojica stating her interest, with a copy to Smoote.

60.    Moore received no response.

61.    As a result of the news that Fuller would be her boss, Moore was then effectively moved within the security team from Squad A to Squad B.

62.    In early February 2023 just before the St. Louis Mardi Gras celebration, which would occur on Saturday, February 18, 2023, Smoote told Moore that the celebration day would be a mandatory work day.

63.    Moore told Smoote she was not scheduled to work that day, because Squad B was off that day.

64.    Moore was scheduled on that day for Moline Acres.

65.    Two weeks before that day Smoote had sent an email stating that Mardi Gras would be a mandatory work day, but Moore does not recall receiving it.

66.    Due to Moore working two jobs, of which Smoote was well aware, it was essential and

reasonable that Moore's schedule be firm many weeks in advance.

67.    Before this 2023 Mardi Gras allegedly mandatory work day issue arose, that had always

been the case without difficulties

68.    For the prior five years the Mardi Gras Celebration Day had not been a mandatory work

day.

69.    On information and belief Smoote lacked authority to unilaterally require Moore to work

that day.

70.    To Moore's knowledge, never while she was there had Metro ever ordered people to

work days in addition to the days for which they were previously scheduled.

71.    It was either a formal or informal policy that people would not have to work days in

addition to the days for which they were previously scheduled.

72.    Metro's attempt to enforce a policy which did not exist is evidence that Metro's

allegation that Moore could be discharged for not working the Mardi Gras Celebration

Day was a pretext.[1]

73.    Moore did not report for work at Metro on the day of the St. Louis Mardi Gras

celebration, Saturday, February 18, 2023.

74.    By then Moore had been denying Smoote sex for many months.

75.    At 3:49 p.m. that day Mojica called Moore and said that he had received a call from

Smoote and that Moore was not to come back until further notice.

76.    The following Monday, February 20, 2023, Moore wrote Smoote a text asking for

"clarity."  They then spoke on the phone.  Smoote said Moore was suspended one week

without pay due to "no call no show."

---

[1] *Nelson v. Lake Elmo Bank*, 75 F.4th 932, 938 (8th Cir. 2023).

8

77.   Moore responded that Mardi Gras was her day off under the new schedule which had been set by Smoote and Mojica.  That was the end of the call.

78.   The story of those days indicates that Smoote was intimately involved in the decision to discipline, and as will be seen below, was also intimately involved in the decision to constructively discharge Moore.

79.   Moore has not spoken to Smoote since then, although she has never formally stated to Smoote that the affair is over.

80.   Moore received no communication from Metro indicating a new schedule or when she would be called back to work.

81.   Moore was scared and so did not call Metro herself, but instead waited for approximately two weeks for a call indicating when to come to work.

82.   On March 1, 2023, Moore called Human Resources and spoke to "Hopkins" who referred her to "Cathy."  The next day Cathy referred Moore to Tadessa J. Murray.

83.   Moore spoke to Murray and explained that that she had been scheduled off for Mardi Gras and the only day which was a mandatory Metro work day was July 4.

84.   Moore also described to Murray her long standing problem that she was not receiving emails because her Metro phone was not working properly.  Moore explained to Murray that she was uncomfortable using her personal phone for Metro business, and had told Metro that, but no one cared that her work phone did not work, and the problem made communication difficult.

85.   Murray stated she lacked information and would call Moore back.

86.   There then ensued a back and forth dispute by phone between Moore and Murray over whether it was correct that Moore did or did not have to work Mardi Gras, and whether

Moore had engaged in misconduct by not working.

87.    Moore did in fact have no duty to agree to work that day.

88.    On March 13, 2023, Murray contacted Moore and told her to report for work March 14, 2023, Moore declined and through undersigned counsel indicated in writing that she had been constructively discharged.

89.    That letter was equivalent to her resignation.

90.    Metro took no remedial action.

91.    Moore had been discriminated against by Metro, through the actions of Smoote in that he created the Mardi Gras dispute to have an excuse to discharge Moore, to the point where a reasonable person in her position would have felt compelled to resign.[2]

92.    Any allegation that Moore's failure to work on the Mardi Gras Celebration Day was the reason for her discharge is a pretext.

93.    Metro, through Smoote, fired Moore in retaliation for her ending her sexual relationship with Smoote.

94.    The affair had at all times violated Metro's policies and rules.

95.    A few days later, after Moore, by counsel W. Bevis Schock, had notified Metro about the affair, Metro fired Smoote and banned him from the property.

96.    After Metro constructively discharged Moore she worked part-time for various employers, and then she regained full time employment as a police officer in the City of Normandy.

97.    Moore worked for Normandy until October 9, 2023, when she gained full time

---

[2] *Green v. Brennan*, 578 U.S. 547, 555 (2016), and see *Crudup v. City of Omaha*, No. 8:21CV45, 2022 WL 3587119, at *2 (D. Neb. Aug. 22, 2022)

employment with the St. Louis Airport Police.

## ADVERSE AND UNLAWFUL EMPLOYMENT PRACTICE

98.     Metro's hostile work environment arose when Moore's refusal of sex had the effect of others unreasonably interfering with her work performance and creating an intimidating, hostile, or offensive working environment.[3]

99.     Moore suffered a "tangible job detriment resulting from refusal of advance."[4]

100.    Metro's workplace was permeated with discriminatory intimidation, ridicule, and insult sufficiently severe or pervasive to alter the conditions of Moore's employment and created an abusive working environment.[5]

101.    The adverse employment actions were an adverse and unlawful employment practice by Metro and Smoote.

102.    The adverse employment actions would not have occurred but for Moore ending the sexual relationship with Smoote.

103.    On inference, Smoote had a significant influence on the decision to constructively discharge Moore.

## OTHER INCIDENTS

104.    Metro has the reputation among the employees of not doing anything in situations like this.

105.    For example, Angie Cuberson filed a complaint and there was no result.  As another example, as outlined in the Petition in Goforth v. Bi-State, *et al.*, 2322-CC01269, removed to federal court, 23-CV-01157-SRW see paras. 16&c., at the approximate

---

[3] *Anda v. Wickes Furniture Co.*, 517 F.3d 526, 531 (8th Cir. 2008).
[4] *Coe v. N. Pipe Prod., Inc.*, 589 F. Supp. 2d 1055, 1086 (N.D. Iowa 2008).
[5] *Anda v. Wickes Furniture Co.*, 517 F.3d 526, 531 (8th Cir. 2008).

beginning of the period relevant to this claimant's story a different victim informed

Smoote that she was being sexually harassed by two Metro employees and was subject to

retaliation.

106.    Those persons were not subject to constructive discharge or other bad acts by Metro.

107.    Plaintiff expects discovery to reveal other incidents in which Plaintiff's comparators were

not discharged on the basis of gender when they ended affairs with their supervisors.[6]

### QUID PRO QUO HARASSMENT
### HOSTILE WORK ENVIRONMENT HARASSMENT, AND
### RETALIATION

108.    Moore was subject to quid pro quo harassment, because her rejection of her supervisor's

unwelcome sexual advances was used as the basis for employment decisions. [7]

109.    Moore was subject to hostile work environment harassment because her workplace was

permeated with discriminatory intimidation, ridicule, and insult which was sufficiently

severe or pervasive to alter the conditions of her employment and create an abusive

working environment.

### DECISION MAKER

110.    In the alternative, Smoote was the final decision maker in the determination to engage in

conduct the effect of which was to constructively discharge Plaintiff.

111.    In the alternative, Smoote was not the final decision maker in the determination to engage

---

[6] *Ma v. Nucor Corp.*, No. 3:19-CV-00344-KGB, 2022 WL 3716474, at *6–7 (E.D. Ark. Aug. 29, 2022), citing *Tenge v. Phillips Modern Ag Co.*, 446 F.3d 903, 908 (8th Cir. 2006) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)

[7] See generally *Rowles v. Curators of Univ. of Missouri*, 983 F.3d 345, 354 (8th Cir. 2020) for endorsement of proposition of discovery producing comparators, although additional discovery denied in that case.  See also *Tenge v. Phillips Mod. Ag Co.*, 446 F.3d 903, 908 (8th Cir. 2006), a case describing actionable harassment, but with wholly different facts because the termination of employment was for flirting and sexual conduct, but here termination was for ending the sexual conduct.

in conduct the effect of which was to constructively discharge Plaintiff, but he was

motivated by discriminatory animus, and he intentionally and proximately caused the

action.[8]

## CONSTRUCTIVE DISCHARGE

112.    Moore gave Metro a reasonable opportunity to correct the intolerable condition before

---

[8] These would be the facts in a "cat's paw case," discussed by the Supreme Court in *Staub v. Proctor Hosp.*, 562 U.S. 411, 416, (2011) and *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2350 (2021).  The reference to "cat's paw" originates in an Aesop's fable in which a monkey and a cat are roasting chestnuts in a fire, the monkey uses flattery to convince the cat to reach into the fire to get out the chestnuts so they can enjoy them together, the cat burns its paws in the process, and while the cat is focused on its burnt paws, the monkey runs off with all the chestnuts.  Thus, the cat, acting in what it had been convinced was in its self interest, that is, to get the yummy roasted chestnuts out of the fire so it could enjoy the chestnuts with the monkey, ended up with burnt paws and no chestnuts.  As the source of the reference to "cat's paw" the *Staub* court cited The Honorable Richard Allen Posner's decision in *Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990).  In *Shager* a prejudiced manager convinced a lazy committee to discharge an employee without the committee engaging in its own investigation.  Judge Posner found that the employer could not escape liability by claiming innocent ignorance and blaming the manager.  Judge Posner called the manager's prejudice his "cat's paw."  In *Vandiver v. Little Rock Sch. Dist.*, No. 4:03-CV-00834 GTE, 2007 WL 2462023, at *17 (E.D. Ark. Aug. 27, 2007), however, the court said: "the ultimate decisionmaker could inherit the taint of discriminatory intent if he 'merely acted as a rubber stamp,' or the 'cat's paw,' for a subordinate employee's prejudice, even if the manager lacked discriminatory intent."  In *Richardson v. Sugg*, 448 F.3d 1046, 1060 (8th Cir. 2006) the Eighth Circuit seems to agree that the cat's paw is the duped investigator.  All this creates confusion over who is the cat, who is the monkey, and what is the paw.  While Posner has the manager's prejudice as the paw, respectfully, (and surreally for undersigned counsel for he cannot imagine disagreeing with Judge Posner over anything ever), undersigned counsel believes *Vandiver* and *Richardson* have it right and Posner has it wrong.  It is the employer who is the cat, for it is the employer who suffers the burned paws, that is the liability, and it is the tricky manager who is the monkey, for it is the tricky manager who has wrongfully convinced the committee to take an action which it believes to be in its interest - discharge of the employee with no ill effects to itself, but which actually causes it harm.  For readers who might already be having trouble sorting out the fine points of the analogy between the Aesop fable and employment law, undersigned counsel recommends against spending too much time on the science behind the physics thought experiment known as "Schrödinger's Cat," in which a cat is at the same time both dead and alive.  (Undersigned counsel notes that in both *Staub and Brnovich* the Supreme Court never figured out who was the cat, who was the monkey, or what was the paw, and the Supreme Court thus artfully dodged doing the hard work of sorting it out itself).

13

she terminated her employment in that she had numerous discussions with Murray regarding the Mardi Gras Celebration Day, and she received no relief.[9]

113.   Metro's insistence that Moore work the Mardi Gras Celebration Day when she had no duty to do so is evidence that Metro intended to force Moore to quit.

## DAMAGES

### Garden Variety Emotional Distress

114.   Moore has suffered garden variety emotional distress, including but not limited to humiliation, mental anguish, inconvenience, loss of enjoyment of life, lowered feelings of self worth, anxiety, nightmares, and fear for our community.

115.   Moore has suffered humiliation before her fellow employees and ridicule by her fellow employees.  For example, when Moore would get to work her fellow employees would ask her "Did you talk to Smoote?"

116.   Moore was shamed.  Once the relationship began, she was afraid of losing her job if she complained to higher management.

117.   Metro has an atmosphere of fear in which employees fear being fired.  In that atmosphere Moore felt that her colleagues were shaming her behind her back.

118.   After Moore left Metro, Culbertson said to other officers that Moore had "laid on her back and didn't get anything out of it."

119.   That sort of talk was occurring during the time Moore worked at Metro and the affair was going on.

### No Economic Damages

120.   Moore has no lost wages or medical expenses.

---

[9] *Turner v. Honeywell Fed. Mfg. & Techs., LLC,* 336 F.3d 716, 724 (8th Cir.2003).

14

**Punitive Damages**

121.   The conduct of Metro was malicious or recklessly indifferent to Plaintiff's right not to be discriminated against on the basis of her gender.[10]

122.   Metro knew that both the discharge and the retaliation were in violation of the law prohibiting gender discrimination or acted with reckless disregard of that law.

123.   The offensive conduct of Metro calls for deterrence and punishment over and above that provided by compensatory awards, and its conduct was motivated by evil motive or intent, and/or involved reckless or callous indifference to the federally protected rights of Plaintiff.[11]

124.   These circumstances provide an inference that the adverse employment action of constructive discharge demonstrates discrimination based on Moore's membership in a protected class.

## ATTORNEY'S FEES

125.   In pursuit of her claims, Moore is incurring reasonable statutory attorney's fees, taxable costs, and non-taxable costs.

## CAUSATION

126.   All the damages suffered by Plaintiff were the direct and proximate results of the actions of Metro and its employee, Smoote.

## COUNT I
## HOSTILE WORK ENVIRONMENT

127.   Plaintiff incorporates all prior paragraphs.

---

[10] 8th Cir Model Jury Instruction 5.72
[11] *Naucke v. City of Park Hills*, 284 F.3d 923, 929 (8th Cir. 2002)

15

128. *First*, Moore is female, which means she is in a protected class,[12] and

129. *Second*, after Moore denied Smoote sex Moore was subject to on-going unwelcome harassment. and

130. *Third*, a casual nexus exists between the harassment and the protected group status, and

131. *Fourth*, the harassment affected a term, condition, or privilege of employment, that is, Moore was subject to on-going unwelcome harassment including shaming, failure to give her a working cell phone, lack of promotion and constructive discharge, and

132. *Fifth*, Metro knew or should have known of the harassment and failed to take proper action, in that Mojica and/or Summers were aware of the situation and did nothing.

133. *Sixth,* Moore sustained damage.[13]

134. Actions of Smoote and/or others in discharging Plaintiff were taken in the scope of their employment with Metro and so are attributable to Metro.[14]

135. The conduct of Metro and its employees was malicious or recklessly indifferent to Plaintiff's right not to be discriminated against on the basis of her gender, beyond all bounds of human decency, and therefore Plaintiff is entitled to punitive damages.[15]

WHEREFORE, Plaintiff prays for judgment against Metro for compensatory and punitive damages, attorney's fees, taxable and non-taxable costs, and such other orders and judgments as the court finds to be just, meet, and reasonable.

## COUNT II
## TITLE VII – GENDER DISCRMINTION

---

[12] *Hurt v. MFA Inc.*, No. 20-CV-06106-SRB, 2021 WL 4139141, at *5 (W.D. Mo. Sept. 10, 2021).
[13] *Warmington v. Bd. of Regents of Univ. of Minnesota*, 998 F.3d 789, 799 (8th Cir. 2021).
[14] 8th Cir. Mod. Jur. Instrucs. 5.23 regarding agency.
[15] 8th Cir. Mod. Jur. Instrucs. 5.72 regarding punitive damages.

136.   Plaintiff incorporates all prior paragraphs.

137.   *First*, Moore is female, which means she is in a protected class,[16] and

138.   *Second*, Moore was meeting her employer's legitimate job expectations, and

139.   *Third*, Moore was passed over for promotions and was constructively discharged, and

140.   *Fourth,* Moore was treated differently than similarly situated employees who were and
       were not members of her protected class, and

141.   *Fifth*, Moore sustained damage.[17] [18]

142.   Actions of Smoote and/or others in discharging Plaintiff were taken in the scope of their
       employment with Metro and so are attributable to Metro.[19]

143.   The conduct of Metro and its employees was malicious or recklessly indifferent to
       Plaintiff's right not to be discriminated against on the basis of her gender, beyond all
       bounds of human decency, and therefore Plaintiff is entitled to punitive damages.[20]

       WHEREFORE, Plaintiff prays for judgment against Metro for compensatory and punitive
damages, attorney's fees, taxable and non-taxable costs, and such other orders and judgments as
the court finds to be just, meet and reasonable.

## COUNT III
## TITLE VII – CONSTRUCTIVE DISCHARGE

144.   Plaintiff incorporates all prior paragraphs.

145.   *First*, a reasonable person in Moore's situation would have found the working conditions

---

[16] *Hurt v. MFA Inc.*, No. 20-CV-06106-SRB, 2021 WL 4139141, at *5 (W.D. Mo. Sept. 10, 2021).

[17] *Rebouche v. Deere & Co.*, 786 F.3d 1083, 1087 (8th Cir. 2015).

[18] 8th Cir. Mod. Jur. Instrucs. 5.40. See also *Tisdell v. McDonough*, No. 21-3658, 2023 WL 2486083, at *2 (8th Cir. Mar. 14, 2023).

[19] 8th Cir. Mod. Jur. Instrucs. 5.23 regarding agency.

[20] 8th Cir. Mod. Jur. Instrucs. 5.72 regarding punitive damages.

17

intolerable,

146.   *Second*, Metro intended to force Moore to quit.

147.   *Third*, Moore resigned.

148.   *Fourth*, Moore sustained damage.[21] [22]

149.   Actions of Smoote and/or others in discharging Plaintiff were taken in the scope of their
employment with Metro and so are attributable to Metro.[23]

150.   The conduct of Metro and its employees was malicious or recklessly indifferent to
Plaintiff's right not to be discriminated against on the basis of her gender, beyond all
bounds of human decency, and therefore Plaintiff is entitled to punitive damages.[24]

WHEREFORE, Plaintiff prays for judgment against Metro for compensatory and punitive
damages, attorney's fees, taxable and non-taxable costs, and such other orders and judgments as
the court finds to be just, meet and reasonable.

Respectfully Submitted,

  /s/ W. Bevis Schock   .
W. Bevis Schock, 32551MO
Attorney for Plaintiff
7777 Bonhomme Ave., Ste. 1300
St. Louis, MO  63105
wbschock@schocklaw.com
Fax:    314-721-1698
Voice: 314-726-2322

---

[21] *Anda v. Wickes Furniture Co.*, 517 F.3d 526, 534–35 (8th Cir. 2008).
[22] 8th Cir. Mod. Jur. Instrucs. 5.40. See also *Tisdell v. McDonough*, No. 21-3658, 2023 WL
2486083, at *2 (8th Cir. Mar. 14, 2023).
[23] 8th Cir. Mod. Jur. Instrucs. 5.23 regarding agency.
[24] 8th Cir. Mod. Jur. Instrucs. 5.72 regarding punitive damages.